**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JAMES WILLIAM RAY BLEVINS,**

     **Plaintiff,**

**v.**                                 **Case No.: 2:14-cv-01572**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-motions for judgment on the pleadings as set forth in their briefs. (ECF Nos. 10, 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED;** that the Commissioner's motion for judgment on the pleadings be **GRANTED**, that the decision of the Commissioner be

**AFFIRMED,** and that this case be **DISMISSED,** with prejudice, and removed from the docket of the Court.

## I.   Procedural History

James William Ray Blevins ("Claimant") filed an application for SSI on April 26, 2011, alleging a disability onset date of February 11, 2011, (Tr. at 117), due to "neck problems, anxiety, depression, hip problems, blood sugar problems, tendonitis in shoulders, feet, and wrists, gout." (Tr. at 152). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 11). Claimant filed a request for an administrative hearing, which was held on September 17, 2012 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 27-54). By written decision dated September 26, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-22). The ALJ's decision became the final decision of the Commissioner on November 20, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant then filed a brief seeking reversal, or reversal and remand, of the Commissioner' decision, and the Commissioner filed a brief in support of her decision. (ECF Nos. 10, 11). Claimant also filed a reply memorandum. (ECF No. 12). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 51 years old at the time of his application for SSI, and 52 years old at the time of the ALJ's decision. (Tr. at 31, 117). He communicated in English, had a

GED, and also obtained a certification in woodworking. (Tr. at 151, 153). Claimant's prior employment history included various positions as a general laborer. (Tr. at 153).

III.  **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After

making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social

4

functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

Here, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since April 15, 2011, the application date.[1] (Tr. at 13, Finding No. 1). At the second step of the evaluation, the ALJ attributed the following severe impairments to Claimant: "rheumatoid arthritis, epicondylitis, and depression." (Tr. at 13, Finding No. 2). Under the third inquiry, the ALJ determined that Claimant's impairments, either individually or in combination, failed to meet or medically equal any of the listed impairments. (Tr. at 13-15, Finding

---

[1] The application in the record is dated April 26, 2011, but the discrepancy is not important to this review.

No. 3). Accordingly, the ALJ determined that Claimant had:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can occasionally lift twenty pounds and ten pounds frequently. He can stand and walk six hours and sit at least six hours in an eight-hour workday. He can only occasionally reach overhead, climb, balance, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to extreme heat, cold, vibrations, and hazards. He is limited to simple routine repetitive work with occasional interaction with co-workers and supervisors, and only superficial interaction with the general public. He is limited to simple work decision [sic] with no fast-paced production requirements and few if any changes in work routine.

(Tr. at 15-21, Finding No. 4). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's age, education, and past work experience, in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1960, and was defined as an individual closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because his past relevant work was unskilled. (Tr. at 21, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, including work as an night cleaner, laundry sorter, and night patrol inspector. (Tr. at 21-22, Finding No. 9). Accordingly, the ALJ concluded that Claimant had not been under a disability, as defined in the Social Security Act, since the date the application was filed. (Tr. at 22, Finding No. 10).

## IV.  Claimant's Challenges to the Commissioner's Decision

Claimant argues that the Commissioner's decision is not supported by substantial

evidence because the ALJ (1) erred at step two of the sequential evaluation process when she failed to find that Claimant's carpal tunnel syndrome was a severe impairment, (ECF No. 10 at 12-13); and (2) failed to properly account for Claimant's hand limitations and limitations in walking and standing when assessing his RFC. (*Id.* at 9-11).

In response, the Commissioner contends that the ALJ is not required to include every diagnosis at step two of the process. Instead, as long as the ALJ finds that a severe impairment exists and moves to the next step in the process, the claimant is not prejudiced if a particular diagnosis is not discussed. (ECF No. 11 at 8-10). As far as Claimant's allegation that the ALJ failed to account for limitations in handling, walking, and standing when crafting the RFC findings, the Commissioner points to the ALJ's written decision, which addresses Claimant's capacity to stand, walk, and sit and discusses the records related to carpal tunnel syndrome. According to the Commissioner, the ALJ based the RFC findings on substantial evidence, including medical tests and observations, consultant evaluations, and Claimant's self-reported activities. (Id. at 10-12).

## V.  Relevant Medical History

The undersigned has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The following summary of Claimant's treatment and evaluations is limited to those entries most relevant to the issues in dispute.

### A.  Treatment Records

On December 29, 2009, Claimant presented to Camden Clark Hospital ("CCH") with complaints of intermittent pain in the lumbar spine. (Tr. at 311-12). He denied any trauma and reported that the pain was not relieved with analgesics such as Tylenol and

Motrin. An x-ray showed spurring, but no subluxation of the lumbosacral spine. Claimant was given the diagnosis of acute myofascial strain of the lumbosacral spine with spurring, and he was treated with medications for pain relief. (*Id.*). He was discharged to home and given a release to return to work in three days. (Tr. at 309). At Claimant's next physician visit on May 11, 2010, an examination of his back was noted to be normal, and his only complaint involving the musculoskeletal system was "gout." (Tr. at 202-03).

Claimant returned to his family physician's office on August 10, 2010 for a three-month follow-up visit. (Tr. at 200-01). His primary musculoskeletal complaint was swelling of his foot, which he thought might be related to gout. The examination of Claimant's back and extremities was documented as normal. (Tr. at 201). The plan was to test Claimant for a recurrence of gout. On his three-month follow-up visit in November, Claimant had no complaints of joint pain or any other issues involving the musculoskeletal system, and no mention was made regarding gout. His examination was documented as normal. (Tr. at 199). In February 2011, at a psychiatric assessment, Claimant denied significant physical complaints and had no past medical history. (Tr. at2 45-47).

On April 7, 2011, Claimant was seen in the Emergency Department at CCH with complaints of intermittent neck pain that went down both shoulders. (Tr. at 313-14). A musculoskeletal assessment revealed circulation, motion, and sensation were intact, and range of motion was normal in all extremities. An x-ray of Claimant's cervical spine was negative. (Tr. at 208). Claimant returned to the Emergency Department at CCH on May 11, 2011 with continued complaints of neck pain, which he rated as six on a ten-point pain scale. He reported that he was out of pain medication. (Tr. at 317-20). Claimant

was assessed with chronic neck pain and told to seek pain management upon discharge. (Tr. at 319). He was treated in the Emergency Department with several medications administered both by injection and mouth and was also given a prescription for Flexeril, Motrin 600 mg, Ultram, and Medrol. (*Id.*).

On June 23 and July 15, 2011, Claimant sought treatment at the Emergency Department of St. Joseph's Hospital in Parkersburg, West Virginia for ongoing neck pain. (Tr. at 390-93). After addressing the acute problem, the attending physician told Claimant that he needed to see a primary care physician for follow-up. (Tr. at 392). However, the next time Claimant sought treatment was on August 6, 2011, when he presented to the Emergency Department at CCH complaining of foot symptoms related to gout. (Tr. at 321-23). Claimant stated that his left foot "feels like there is a house on it." (Tr. at 321). He rated his pain as ten on a ten-point scale, stating that it started two to three days earlier and it felt like pressure. Claimant's left foot was observed to be swollen and red. The attending physician diagnosed Claimant with an acute exacerbation of gout-left first metatarsal joint. (Tr. at 323). He prescribed medication and discharged Claimant to home.

On September 7, 2011, Claimant presented to the Good Samaritan Clinic as a new patient and was seen by Barbara Lott, FNP-C. (Tr. at 329-31). His chief complaints were tendinitis, gout, and pain. According to Claimant, about one year earlier, he had started to intermittently ache all over. Now, he felt aching in all of his joints when he moved, which was worse when he first got out of bed in the morning. (Tr. at 329). Claimant also reported an increase of gout flare-ups and ankle swelling. On musculoskeletal examination, Nurse Lott noted grossly normal joints without deformities, masses, or nodules; grossly normal muscles without deformities, masses, nodules, or wasting;

normal muscle strength in the upper and lower extremities; full range of motion in the neck and spine with normal curvature; no pain on palpation; but voiced pain in joints on movement. (Tr. at 330). Nurse Lott diagnosed Claimant with pain in joints and gout. She suggested they collect Claimant's records from the Emergency Departments so she could determine what additional tests needed to be ordered to pinpoint the source of his pain. Nurse Lott wrote Claimant a prescription for Naproxen and an anti-depressant. (*Id.*).

Claimant returned to the clinic for follow-up on October 5, 2011. (Tr. at 326-27). He reported that he continued to have pain in multiple joints, but mainly the right thumb, left shoulder/collar bone, and bilateral knees and feet. Naproxen was not helping to relieve the pain. He described the pain as being worse in the morning and stated that many days, it was hard for him to get out of bed. (Tr. at 326). This time on examination Nurse Lott found evidence of mild edema in Claimant's right thumb. She ordered some blood tests, including a test for rheumatoid arthritis, discontinued Claimant's Naproxen, and wrote him a prescription for a higher dosage of the anti-depressant. (Tr. at 327). On October 12, 2011 Nurse Lott telephoned Claimant to discuss the results of his laboratory work. (Tr. at 325). She advised Claimant that several of his tests were elevated, like glucose and cholesterol, and these could be effectively lowered with some diet changes. She also told Claimant that he had tested positive for rheumatoid arthritis and needed to see a specialist for further evaluation and care. She arranged an appointment for Claimant with Dr. Brar, a rheumatologist. (*Id.*).

Claimant had his first visit with Dr. Brar on November 4, 2011. (Tr. at 283-84). Claimant told Dr. Brar that his symptoms began in February 2011 and started with warmth, tenderness, and swelling with moderate to severe joint pain in the left TM joint,

cervical spine, shoulders, elbows, wrists, the knuckles of his hands, his hips, knees, ankles, and feet. He complained of morning stiffness that lasted approximately three to four hours. Claimant also complained of a subcutaneous nodule over the left elbow. In addition, he described signs and symptoms suggestive of right carpal tunnel syndrome. (Tr. at 283). On examination, Dr. Brar found abnormalities involving the joints of the neck, elbows, hips, shoulders, fingers, knees, ankles, and wrists. He diagnosed Claimant with "severe uncontrolled seropositive nodular active rheumatoid arthritis." Dr. Brar ordered additional laboratory tests, as well as x-rays. (*Id.*). He prescribed methotrexate and prednisone, and encouraged Claimant to establish regular care with a primary care provider. (Tr. at 284). X-ray reports of the hands and wrists revealed no significant arthritic process. (Tr. at 286).

Claimant returned to Dr. Brar's office on December 5, 2011 and reported improvement with the methotrexate. (Tr. at 340). He indicated that his morning stiffness lasted only about one hour now. His rheumatologic examination showed improvement with less pain and swelling in the joints. Dr. Brar diagnosed Claimant with "severe seropositive nodular rheumatoid arthritis, responding well to treatment." He increased Claimant's dosage of methotrexate and decreased his dosage of prednisone. (*Id.*).

Claimant presented to the office of Dr. Katrina Barnes on December 6, 2011 to establish primary care. (Tr. at 362-65). He reported that he had been diagnosed with rheumatoid arthritis one and half months earlier and was doing some better now that he was on medication. Claimant had a full range of motion in all of his joints, normal muscle strength, and no edema. (Tr. at 363). Dr. Barnes assessed Claimant's rheumatoid arthritis as stable on medication. Her assessment was confirmed by Claimant's next visit

with Dr. Brar on January 16, 2012. (Tr. at 339). On that visit, Claimant was noted to be doing well; his symptoms had decreased; and his functional status assessment was normal. (*Id.*). He reported having injuring his left ankle recently, but after receiving a temporary increase in prednisone, his ankle injury was improving.

On February 15, 2012, Claimant saw Dr. Brar for a painful and swollen left ankle. (Tr. at 339). Despite the visit one month earlier for some sort of event involving the left ankle, Claimant denied an injury. He was diagnosed with persistent rheumatoid synovitis of the left ankle, scheduled for arthrocentesis to be followed by intra-articular injection, fitted for an ankle brace, and told to restrict weight-bearing for two weeks. (*Id.*).

Claimant reported to Dr. Barnes at his next visit on February 28, 2012 that he was having a lot of problems with his left ankle and was waiting for the brace to be ready. (Tr. at 360-61). His examination was unremarkable, and he was noted to be stable. Dr. Barnes ordered some screening laboratory tests and scheduled Claimant for routine follow-up in six months. (Tr. at 361).

On March 27, 2012, Dr. Brar performed the first ankle injection. (Tr. at 338). Claimant tolerated the procedure well. At follow-up on April 9, 2012, Dr. Brar documented that the ankle had done well since the injection, showing less swelling. (*Id.*) Claimant reported that his morning stiffness lasted only about one half hour now. On examination, Claimant's symptoms had decreased significantly. Dr. Brar diagnosed Claimant with "severe rheumatoid arthritis, well controlled on current treatment." (Tr. at 338). He ordered various laboratory tests to check for toxicity and instructed Claimant to continue taking his medications.

On April 30, 2012, Claimant was evaluated by Michael Shramowiat, M.D., a pain

medicine specialist. (Tr. at 394-95). Claimant's chief complaint was elbow pain, and bilateral knee pain with activity. He provided a history of rheumatoid arthritis, for which he took several medications and wore an ankle brace. Claimant reported having pain, weakness, and numbness in the arms, back, feet, hands, hips, legs, neck, and shoulders. Dr. Shramowiat performed an examination and found a normal cervical range of motion; bilateral upper and lower extremity strength of 5/5; grossly intact sensation; but numerous tender points and trigger points in the cervical and lumbar paravertebral region. (Tr. at 395). Dr. Shramowiat diagnosed left lateral epicondylitis and myalgias and myositis. He gave Claimant a left lateral epicondyle injection. (*Id.*). Claimant was instructed to return in one month.

### B. Disability Evaluations

On October 4, 2011, Dr. Rakesh Wahi performed a physical examination of Claimant at the request of the SSA. (Tr. at 266-71). Dr. Wahi noted that Claimant's allegations included neck problems; anxiety; depression; hip problems; blood sugar problems; tendonitis in the shoulder, feet, and wrists; and gout. (Tr. at 266). However, Claimant advised Dr. Wahi that he was not having problems with blood sugar at the present time. Regarding his gout, Claimant reported that in the 1990's he developed pain in his feet that was later diagnosed as gout, although Claimant admitted that he had never had a uric acid test result that confirmed the diagnosis. As to his musculoskeletal problems, Claimant described the pain in his neck as significant and stated that this pain prevented him from turning his head from side-to-side. (Tr. at 267). He also described feeling stiff in the morning, adding that he spent most of the day standing because it was difficult for him to get up from a sitting position. Claimant indicated that his left shoulder, left hip, and hands are very painful, restricting his

movements and causing pain when he walks. (*Id.*).

Dr. Wahi thoroughly examined Claimant's extremities. (Tr. at 269). He observed that Claimant's gait and station were normal, and he was able to get on and off the examination table without difficulty. Claimant could walk on heels and toes, and could do a modified squat. Claimant had normal range of motion in his wrists, although movement was painful. His elbows had normal range of motion, but Claimant's shoulders had a varied and reduced range. All of Claimant's hip movements elicited pain. His grip strength, muscle strength, sensation, and fine manipulation were all intact and normal. (*Id.*). Dr. Wahi diagnosed Claimant with degenerative joint disease involving the cervical spine, carpal tunnel syndrome involving the right hand, and gout by history. Dr. Wahi opined that Claimant's gout could not be confirmed without blood test results; Claimant had symptoms of carpal tunnel syndrome of the right hand; and Claimant was able to carry out his daily activities, but could not stand for long periods of time. (Tr. at 270).

Agency consultant, Dr. Rogelio Lim, completed a Physical Residual Functional Capacity Assessment on October 7, 2011 based upon the report of Dr. Wahi's examination and a review of medical records and other documents in Claimant's disability file. (Tr. at 273-80). Dr. Lim noted that Claimant's primary diagnosis was neck pain, with a secondary diagnosis of arthralgia of the hip, feet, and shoulder, and other alleged impairments included carpal tunnel syndrome, gout, and anxiety. Dr. Lim opined that Claimant had no exertional or postural limitations, explaining that Claimant had unremarkable objective physical findings, and his allegations were out of proportion to the objective evidence. (Tr. at 274-75, 280). Dr. Lim pointed out that on examination by Dr. Wahi, Claimant had a normal range of motion of all joints except his shoulders,

which were a little restricted due to tendonitis. Claimant alleged degenerative joint disease of his neck, yet all of his x-rays were normal, and his cervical range of motion was normal. According to Dr. Lim, the physical restrictions demonstrated by Claimant on examination and testing were non-severe. (Tr. at 280). Dr. Lim further opined that Claimant had no visual, communicative, or environmental limitations either. (Tr. at 276-77). However, Claimant was limited in his ability to reach in all directions, including overhead. (Tr. at 276). Thus, Dr. Lim felt Claimant should be restricted to only occasional abduction of the shoulders and occasional overhead reaching due to tendonitis of the shoulders. (*Id.*).

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether sufficient evidence exists to sustain the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). In other words, the issue for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing

*Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.  Discussion**

Claimant alleges that the ALJ erred at the second and fifth steps of the sequential evaluation process. In particular, he contends that the ALJ failed to consider the alleged impairment of carpal tunnel syndrome at the second step, and as a result, mistakenly omitted carpal tunnel syndrome from the list of severe impairments. According to Claimant, this error was prejudicial because without carpal tunnel syndrome in the list of severe impairments, the ALJ failed to account for the syndrome's functional consequences in the RFC findings. In addition to leaving out limitations related to carpal tunnel syndrome, Claimant argues that the ALJ likewise ignored significant evidence establishing his inability to walk and stand for extended periods of time and thus failed to include restrictions in the RFC finding related to those functional deficits. Consequently, at step five, the ALJ posed hypothetical questions to the vocational expert that did not accurately reflect the extent of Claimant's functional impairments. Therefore, in Claimant's view, the decision of the Commissioner is not supported by substantial evidence.

Having thoroughly reviewed the record, the undersigned finds that neither challenge raised by Claimant has merit.

### A.  Carpal Tunnel Syndrome and Step Two of the Disability Determination Process

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe.

20 C.F.R. §416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §416.921(a). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a potentially disabling impairment, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of nondisability is made at step two, and the process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) (per curiam) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, the ALJ found that Claimant had several severe impairments; accordingly, the sequential process proceeded to step three. From that perspective, as the Commissioner emphasizes, even if the ALJ erred by not considering carpal tunnel syndrome to be a severe impairment, Claimant suffered no harm because the outcome at step two was the same. Claimant's application for benefits moved on to the next step

in the sequence. Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as any functional effects of the impairment are appropriately considered during the later steps of the process. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D.Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D.Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W.Va. March 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments.").

Claimant's challenge based on the ALJ's failure to consider carpal tunnel syndrome as a severe impairment is unconvincing for three reasons. First, the evidence pertaining to Claimant's alleged carpal tunnel syndrome is simply insufficient to establish a severe impairment. Dr. Brar and Dr. Wahi noted that Claimant had signs and symptoms of carpal tunnel syndrome; however, Claimant was never officially evaluated

for the syndrome. As the ALJ stated, no EMG or nerve conduction studies were performed. Dr. Brar never diagnosed Claimant with the syndrome; instead, after observing the carpal tunnel-like symptoms, he diagnosed Claimant with rheumatoid arthritis, which the ALJ found to be a severe impairment. Furthermore, the first mention of carpal tunnel syndrome in the record is found on October 4, 2011 during Dr. Wahi's examination. (Tr. at 269-70). Symptoms of carpal tunnel syndrome are again mentioned by Dr. Brar one month later on November 4, 2011. (Tr. at 283). Thereafter, as the ALJ points out, nothing else appears in the record pertaining to carpal tunnel syndrome. Instead, Claimant's hand and wrist problems were largely attributed to his diagnosis of rheumatoid arthritis. Even Claimant made no effort to pursue carpal tunnel syndrome as a potential source of pain and limitation. When asked about his medical conditions and their effects at the administrative hearing, Claimant testified extensively about the limitations and pain he suffered as a consequence of his rheumatoid arthritis. Neither Claimant nor his attorney mentioned carpal tunnel syndrome. Certainly, if carpal tunnel syndrome was a severe impairment, Claimant would have supplied evidence establishing the diagnosis, verifying the twelve-month duration requirement, and demonstrating the specific effects of the syndrome on his ability to perform basic work activities. Claimant failed to satisfy his burden.

Second, the ALJ considered all of Claimant's impairments when assessing his RFC, including limitations relating to his hands. Indeed, the ALJ expressly analyzed the evidence pertaining to carpal tunnel syndrome during the written analysis of Claimant's RFC finding. (Tr. at 18, 20). The ALJ noted that Dr. Wahi, who performed a one-time examination of Claimant, documented that Claimant experienced significant symptoms of carpal tunnel syndrome involving the right hand. The ALJ stressed that, nonetheless,

the record contained "no further documentation regarding carpal tunnel syndrome." (Tr. at 18). Additionally, the ALJ commented that "the record contains no EMG/NC or other diagnostic testing to confirm the diagnosis." (*Id.*). Equally as important, the ALJ noted Dr. Wahi's opinion that Claimant "was able to carry out his daily activities" with the only caveat being that Claimant "was unable to stand for long periods of time." (*Id.*). Accordingly, Dr. Wahi, who was the only physician to suggest carpal tunnel syndrome as a potential diagnosis,[2] saw no reason to include restrictions related to that syndrome in his assessment. Later in the written decision, the ALJ again addressed carpal tunnel syndrome and the need for restrictions in the RFC finding to account for that condition. (Tr. at 20). The ALJ reviewed the assessment form completed by Dr. Lim; particularly, his conclusion that Claimant's normal grip strength and intact fine manipulation refuted the diagnosis of carpal tunnel syndrome. (*Id.*). Dr. Lim found no physical limitations associated with Claimant's wrists, hands, or fingers. The ALJ gave significant weight to Dr. Lim's opinions, as well as to the negative x-rays of Claimant's wrists and the normal physical findings. Thus, hand limitations were fully considered and rejected by the ALJ.

Finally, Claimant's challenge must also fail because its premise is fundamentally flawed. Claimant presumes that if the ALJ found carpal tunnel syndrome to be a severe impairment at step two of the process, she automatically was bound to include functional limitations in the RFC finding to account for carpal tunnel syndrome. "To the extent [Claimant] suggests that a finding of severe impairment at Step 2 necessarily requires limitations on a claimant's ability to perform basic work activities, this argument has no merit." *Burkstrand v. Astrue,* 346 F.App'x 177, 180 (9th Cir. 2009); *see*

---

[2] Dr. Brar initially documented that Claimant described the signs and symptoms of carpal tunnel syndrome; however, Dr. Brar never tested Claimant for, nor followed-up on possible carpal tunnel syndrome, and never diagnosed Claimant with that condition.

*also Walker v. Colvin,* No. C13–3021–MWB, 2014 WL 1348016, at *7 (N.D.Iowa Apr.3, 2014) ("A finding of a severe impairment at Step Two does not require the ALJ to provide related functional limitations at Step Four."); *Hughes v. Astrue,* No. 1:09CV459, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011) (holding that a finding of impairment at step two is not "proof that the same limitations have the greater significant and specific nature required to gain their inclusion in an RFC assessment at step four."). As was demonstrated by the ALJ's assessment, whatever symptoms Claimant displayed in his hands and wrists, and whatever their source, the record did not support the conclusion that they caused more than a minimal impact on Claimant's ability to do work-related activities. For that reason, no specific occupational restrictions were necessary.

Therefore, the undersigned **FINDS** that the ALJ did not err at step two of the sequential process when he failed to include carpal tunnel syndrome as a severe impairment. In addition, the undersigned **FINDS** that the ALJ properly considered Claimant's alleged carpal tunnel syndrome when determining Claimant's RFC, and substantial evidence supported the ALJ's determination that limitations related to the alleged impairment of Claimant's hands, wrists, and fingers were not established.

### B. Claimant's RFC and the Hypothetical Questions

Claimant alleges that the ALJ's findings at the fifth step of the sequential process were erroneous because they were based upon hypothetical questions to the vocational expert that did not include all of Claimant's impairments. Specifically, Claimant maintains that in addition to the hand limitations addressed above, the ALJ should have included limitations on walking and standing related to his rheumatoid arthritis. Claimant argues that the ALJ's failure to properly evaluate and include walking and

standing restrictions is particularly prejudicial because it resulted in an RFC finding that was based on the wrong exertional category. According to Claimant, light work, by definition, requires "a good deal of walking and standing." (ECF No. 10 at 11, citing SSR 83-10). He claims that the evidence establishes that he is incapable of walking more than half a mile at one time, and he can stand no more than fifteen minutes before he needs to sit down. Therefore, Claimant is unable to perform light work and should be restricted to occupations categorized at the sedentary exertional level. Claimant points out that the difference in exertional level is critical in his case, because at his age, a restriction to sedentary work mandates a finding of disability under the Medical-Vocational Guidelines listed in Appendix 2 of Subpart P of Part 404 (the "Grids").

At step five of the sequential process, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain*, 715 F.2d at 868-69. The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore*, 538 F.2d. at 574. In order to carry this burden, the Commissioner may rely upon the Grids, "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); *see also* 20 C.F.R. §§ 404.1569, 416.969.

The Grids categorize jobs by their physical-exertion requirements; accordingly,

"[a]t step 5 of the sequential evaluation process, RFC **must** be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do." SSR 96-8p, 1996 WL 374184, at *3 (emphasis added). However, the Grids consider only the exertional component of a claimant's disability, and even then, they do not contemplate all possible variations of exertional levels. 20 C.F.R. §416.969. For that reason, when a claimant has significant nonexertional impairments, has a combination of exertional and nonexertional impairments, or has an RFC that falls between exertional levels, the Grids merely provide a framework to the ALJ, who must give full individualized consideration to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* § 416.969; 20 C.F.R. Pt. 404, Subpart P, App'x 2 § 200.00(d); *see also Haynes v. Barnhart*, 416 F.3d 621, 629 (7th Cir. 2005) (recognizing that where RFC falls between sedentary and light work, Grids are used only as framework); *Hence v. Astrue*, No. 4:12cv1, 2012 WL 6691573, at *8 (E.D. Va. Nov. 30, 2012) (citing the Grids and SSR 83-12 in observing that where a claimant's RFC is between exertional levels, the Grids do not apply), report and recommendation adopted by 2012 WL 6697109 (E.D. Va. Dec. 21, 2012); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 821 (N.D. Ill. 2006) (stating that Grids only provide guidance where claimant falls between exertional levels).

Because the analysis subtly shifts at step five from an assessment of the claimant's limitations and capabilities to the identification of the claimant's potential occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the **most** the claimant can do, rather than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow

substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251, at *2; *see also* SSR 96-8p, 1996 WL 374184, at *2 (recognizing RFC represents most that individual can do given limitations). From there, the ALJ must determine whether the claimant's RFC permits him to perform the full range of work contemplated by the relevant exertional level. SSR 83-10, 1983 WL 31251, at *5. "[I]n order for an individual to do a full range of work at a given exertional level the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184, at *3. If the claimant's combined exertional and nonexertional impairments allow him to perform some of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work contemplated by the exertional level. *See* SSR 83-14, 1983 WL 31254, at *6 ("Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision."). In making this determination, "the ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the

evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan*, 142 F.App'x at 720-21.

At the administrative hearing, the ALJ provided the vocational expert with three hypothetical questions. (Tr. at 48-51). First, the ALJ asked the vocational expert whether there were jobs that someone with Claimant's age, education, and past work experience could perform if that person could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and sit six hours out of an eight-hour workday; occasionally reach overhead; occasionally climb, balance, stoop, kneel, crouch, crawl; and avoid concentrated exposures to extreme temperatures, vibration, and hazards. (Tr. at 48-49). In response to this hypothetical, the vocational expert testified that an individual with those limitations could perform a number of jobs in the light exertional work category, including night cleaner, laundry sorter, and night patrol inspector, and all of these jobs were available in significant numbers in the national and regional

economy. (Tr. at 49). Second, the ALJ asked the vocational expert to assume the same limitations as contained in the first hypothetical question, but to add the additional limitations of only doing simple, routine, repetitive work with occasional interaction with supervisors and coworkers and superficial interaction with the general public. The hypothetical individual would also be limited to only simple work-related decisions, no fast-paced production requirements, and little change in the work environment. (Tr. at 50). Even with those additional limitations, the vocational expert opined that the individual could perform the same three occupations previously identified. (*Id.*). Finally, the ALJ asked the vocational expert to assume the same individual described in the second hypothetical but changed the exertional level from light to sedentary. (Tr. at 51). The vocational expert replied that the individual could work as a sorter, and that occupation was available in significant numbers in the national and regional economy. (*Id.*).

In determining Claimant's RFC, the ALJ adopted the limitations as set forth in his second hypothetical question posed to the vocational expert. (Tr. at 15, 50). The ALJ found that Claimant could perform light exertional work except that he can occasionally lift twenty pounds and ten pounds frequently; he can stand and walk six hours and sit at least six hours in an eight-hour workday; he can only occasionally reach overhead, climb, balance, stoop, kneel, crouch, and crawl; he must avoid concentrated exposure to extreme heat, cold, vibrations, and hazards; he is limited to simple routine repetitive work with occasional interaction with co-workers and supervisors, and only superficial interaction with the general public; and he is limited to simple work decisions with no fast-paced production requirements and few if any changes in work routine. (*Id.*) Because the ALJ asked a hypothetical question that closely tracked Claimant's RFC,

Claimant essentially attacks the RFC finding in conjunction with the hypothetical question. For that reason, an examination of the adequacy of the ALJ's RFC finding is in order.

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the *most* that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the Claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In arriving at his RFC finding, the ALJ thoroughly considered Claimant's description of his activities and symptoms, his medical records, the evaluations and opinions of medical experts who did and did not examine him, and his testimony at the administrative hearing. (Tr. at 14-21). The ALJ first assessed all of the activities and symptoms described by Claimant. (Tr. at 16-17). She then compared those symptoms with the objective medical findings and other evidence in the record. (Tr. at 17-20.) The ALJ specifically noted that Claimant completed an adult function report in which he stated that he was able to drive and use public transportation; he could walk half a mile; and managed personal hygiene with assistance. (Tr. at 14). Claimant spent time with his grandchildren, managed his finances, used the computer, and read the newspaper. At

28

the hearing, Claimant testified that he regularly walked 200 yards up and down a hill to take out the trash and was able to lift around 50 to 60 pounds. (Tr. at 16). Claimant also testified that he continued to look for employment, and stated that he had tried to work as a telemarketer, but was fired after he got into an argument with his supervisor. (Tr. at 17). The ALJ discussed Claimant's complaints of chronic pain in his joints, and depression over his inability to work. (Tr. at 16). However, the ALJ concluded that the objective evidence did not corroborate Claimant's statements regarding the severity, persistence, and limitations of his impairments. (Tr. at 17-20).

Referring to specific parts of the record, the ALJ reviewed Claimant's medical treatment in detail, pointing out various notations and findings that contradicted Claimant's allegations of disabling pain in the joints. For example, the ALJ noted that in November 2010, a progress note prepared by Claimant's family doctor confirmed that he was self-reliant in daily activities and "fully able to manage the household." (Tr. at 17). Claimant was taking no medication for pain, or for degenerative joint disease, arthritis, or musculoskeletal problems. Likewise, a record from the Emergency Department at CCH in April 2011 reflected that Claimant moved all extremities and had a steady gait. While Claimant did have an exacerbation of a cervical strain, a cervical x-ray was unremarkable. (*Id.*). Another examination at CCH one month later was normal. In September 2011, a physical examination at Good Samaritan Clinic revealed that Claimant had a full range of motion. (Tr. at 17-18).

The ALJ also discussed the consultative examination performed by Dr. Wahi, commenting that Claimant's gait was documented as steady; he could perform heel-toe walking and a modified squat; and his fine manipulation was intact. (Tr. at 18). Although Dr. Wahi mentioned possible carpal tunnel syndrome, no testing was

performed to confirm the diagnosis, nor was the condition ever treated. X-rays of Claimant's hand showed no significant arthritic process. Ultimately, Claimant was diagnosed with rheumatoid arthritis, which was successfully treated by Dr. Brar. (Tr. at 18). Shortly after treatment began, Claimant's family physician, Dr. Barnes, noted that Claimant had a full range of motion in all of his joints, and his rheumatoid arthritis was stable with medication. The ALJ indicated that Claimant eventually sought treatment from Dr. Shramowiat, a pain management specialist, who performed an examination in April 2012. Dr. Shramowiat found normal range of motion, normal muscle strength and sensation, with some positive tender points and trigger points. He treated Claimant with a steroid injection, and told Claimant to follow-up, but no other records were produced from Dr. Shramowiat. (Tr. at 18-19). The ALJ concluded that the evidence simply did not substantiate the level of functional impairment alleged by Claimant. The ALJ also believed that Claimant greatly minimized the extent of his daily activities, and his statements were contradicted by the record. The ALJ also emphasized that Claimant had not been entirely truthful to his health care providers when reporting his history; especially pertaining to his use of drugs. (Tr. at 19). Therefore, Claimant's credibility was questionable.

In regard to the medical source opinions, the ALJ gave significant weight to the RFC assessment of Dr. Lim as it was consistent with the record as a whole. (Tr. at 20). Dr. Lim analyzed Claimant's limitations on a function-by-function basis, providing opinions on the extent of Claimant's deficits and explaining the basis for the opinions. Dr. Lim concluded that Claimant had no exertional limitations, no limitations on sitting, standing, or walking, and no limitations or restrictions involving the use of his hands. Dr. Lim did believe that Claimant was only capable of occasional reaching in light of his

shoulder tendonitis. No other medical source provided an opinion that disagreed with the opinion of Dr. Lim. Dr. Wahi stated that Claimant was unable to "stand for long periods of time," but he never quantified what he meant by "long periods of time." Dr. Wahi placed no restrictions on Claimant related to his hands. Moreover, none of Claimant's treating physicians placed him on specific restrictions. The only evidence suggesting that Claimant was severely limited in his ability to stand and walk was Claimant's own statements. The ALJ found those statements not to be credible and identified persuasive evidence to the contrary. Therefore, substantial evidence supports the ALJ's RFC finding.

The ALJ fully complied with the rulings and regulations in determining Claimant's RFC. The ALJ thoroughly discussed and analyzed the medical information and other evidence in the record, explained how she considered and resolved inconsistencies in the evidence, and provided a logical rationale for the limitations she determined were consistent with the record as a whole. The ALJ weighed the medical source statements, and based on the record as a whole, adopted a modified version of the function-by-function assessment prepared by Dr. Lim. Once the ALJ made an RFC finding that included exertional and nonexertional limitations, she properly involved the assistance of a vocational expert. The second hypothetical question posed to the vocational expert incorporated Claimant's RFC, which was supported by substantial evidence. Thus, the vocational expert was asked a proper hypothetical question that set forth all of the Claimant's impairments, and the ALJ was entitled to rely upon the testimony provided in response.

Assuming *arguendo* that Claimant could establish that he truly suffers from the severe walking and standing limitations that he alleges, his contention that these

limitations would *per se* restrict him to sedentary work is, in any event, unavailing. Under the applicable regulation, "sedentary work" is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* § 416.967(a); *see also* SSR 83-10, 1983 WL 31251, at *5 (defining sedentary work). In contrast, "light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b); *see also* SSR 83-10, 1983 WL 31251 at *5-*6 (defining light work). "[T]he ***full range*** of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251 at *6 (emphasis added). The SSA explains that:

> The major difference between sedentary and light work is that most light jobs--particularly those at the unskilled level of complexity--require a person to be standing or walking most of the workday. Another important difference is that the frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist.

SSR 83-14, 1983 WL 31254, at *4; *see also* SSR 83-10, 1983 WL 31251, at *5 (explaining

that the "good deal of walking or standing" in light jobs is "the primary difference between sedentary and most light jobs."). While there are "[r]elatively few unskilled light jobs ... performed in a seated position," there are unskilled light jobs accommodating a standing or walking limitation nonetheless. SSR 83-10, 1983 WL 31251, at *5.

However, Claimant overlooks the possibility that an RFC may fall between exertional categories. *See, e.g.*, *Golini v. Astrue*, 483 F. App'x 806, 808 (4th Cir. 2012) (recognizing that claimant's RFC may exist between exertional categories). An ALJ need not rigidly apply exertional categories to a claimant's impairments; instead, where additional limitations exist such that a claimant does not fall neatly within an exertional category, an ALJ should take those limitations into account when determining a claimant's RFC and appropriately reduce the occupational base to fit the claimant's individual characteristics at step five of the process. *See* 20 C.F.R. §§ 404.1569, 416.969; SSR 83-12, 1983 WL 31253, at *2 (noting that an adjudicator is to consider extent of erosion of occupational base and "access its significance"). If the ALJ is unclear as to the remaining occupational base given any additional limitations, then the ALJ must consult a vocational resource. SSR 83-12, 1983 WL 31253, at *2; *see also* SSR 83-14, 1983 WL 31254, at *6 (stating where ALJ does not have clear understanding of effects of additional limitations on job base, services of a vocational expert are necessary); *Knapton v. Soc. Sec. Admin. Comm'r*, No. 1:13-CV-00168, 2014 WL 1608389, at *5 (D.Me. Apr. 22, 2014) (same). "[A]n RFC limiting standing or walking to about two hours does not mandate a finding that [a claimant] could only perform sedentary work." *Hence*, 2012 WL 6691573, at *8; *see also Norris v. Comm'r Soc. Sec.*, No. WDQ-13-2426, 2014 WL 2612367, at *4 (D.Md. June 9, 2014) (report and recommendation

rejecting argument that RFC limiting claimant's ability to stand and walk to between two and six hours was inconsistent with finding claimant could perform light work); *Knowles v. Colvin*, No. 1:12-cv-371, 2014 WL 1153063, at *7 (S.D.Miss. Mar. 21, 2014) (finding that two-hour standing and walking limitation could be consistent with definition of light work); *Willoughby v. Comm'r, Soc. Sec.*, No. RDB-13-0489, 2013 WL 5496834, at *1 (D.Md. Oct. 2, 2013) (report and recommendation recognizing that two-hour standing and walking limitation did not preclude finding that claimant could perform reduced range of light work); *Lackey v. Colvin*, No. 12-516, 2013 WL 1903662, at *2 (W.D.Pa. May 7, 2013) (rejecting claimant's argument that four-hour standing and walking limitation was inconsistent with ability to perform light work); *Moaney v. Astrue*, No. PWG-09-1838, 2010 WL 3719297, at *3 (D.Md. Sept. 17, 2010) (finding that ability to occasionally lift twenty pounds, frequently lift ten pounds, and stand or walk for two hours was consistent with finding that claimant could perform light work). Significantly, Claimant has not cited any decision in support of his position to the contrary. While Claimant cites SSR 83-10, that ruling does not support his contention. As discussed above, SSR 83-10 sets out the definition for the *full range* of light work. 1983 WL 31251, at *5-*6. The definition of light work includes jobs that can be performed while "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls," SSR 83-10, 1983 WL 31251, at *5, and Claimant does not argue nor do the medical records establish that he cannot perform the requirements of those positions. Furthermore, SSR 83-10 recognizes that there are unskilled light level jobs that may be performed from a seated position. *Id.* The ALJ did not find that Claimant could perform the full range of light work; rather, the ALJ found that Claimant could perform a reduced range of light work given his exertional and nonexertional

limitations. As such, Claimant's contention that his standing and walking limitations *per se* restrict him to sedentary exertional work is not persuasive.

In sum, the undersigned **FINDS** that the ALJ did not err at the fifth step of the sequential process, and the ALJ's decision is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 10); **GRANT** Defendant's motion for judgment on the pleadings (ECF No. 11), **AFFIRM** the final decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S.

140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 29, 2015

Cheryl A. Eifert
United States Magistrate Judge